[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a suit for dissolution of marriage brought by the plaintiff wife against the defendant husband. The parties were married on July 18, 1986 in Milford, Connecticut. They have continued to reside in this state since that date. There are two children issue of the marriage: Jessica Brown Dooling born CT Page 11711 January 23, 1989 and Jamie Brown Dooling born October 8, 1991, now ages eight and six.
The parties met while members of the Milford Police Department in 1982. In 1984 the plaintiff was hired as a Connecticut State Trooper and entered the State Police Training Academy in February, 1984, graduating in August, 1984. After her graduation, the parties commenced living together in a two family house on Milford Beach. Each contributed to the living expenses and each kept separate checking and savings accounts. This continued even after their marriage and until they moved together into their new home at 70 Dawn Drive in Stratford, which is where the plaintiff and the two minor children continue to reside.
There are basically two major issues upon which the parties fail to agree: the issue of sole custody vs. joint custody and the issue of the disposition of the real estate at 70 Dawn Drive, Stratford. The plaintiff seeks the house while the defendant seeks a fifty percent (50%) interest in the house and an order that the house be sold and the net proceeds equally divided, the plaintiff, however, to have first option to buy out the defendant's interest within thirty (30) days of the date of dissolution.
On the issue of custody, however, the defendant has stipulated that the children may reside principally with the plaintiff. Basically, as the court understands the defendant's position, he is seeking two additional overnight visitations per month; that is, on the Sunday evening of his alternate weekend visitations.
There has been a custody evaluation by Family Relations. Ms. Karen Kutno, Family Relations Counselor, appeared in court to testify, and her report is in evidence as plaintiff's exhibit A, that report being dated May 4, 1996. Mr. Rick Pinkowski, Head Family Relations Counselor, also appeared in court to testify and his report is in evidence as plaintiff's exhibit D, which report is dated February 18, 1997. Both reports recommend joint legal custody of Jessica and Jamie, with "primary physical residence to rest with the mother."
Dr. Karen Alexander, a child and forensic psychologist from Danbury, also testified in this proceeding. She testified that the children absolutely rely upon the plaintiff for their care and upbringing. They expressed that they turn to her primarily. CT Page 11712 Dr. Alexander's curriculum vitae and report are in evidence as Children's exhibits 1 and 2. Dr. Alexander's recommendation is for joint legal custody with primary physical residence to remain with the plaintiff.
An essential element of an order of joint custody, however, is that the parties be able to communicate on important issues in the children's best interests. See Emerick v. Emerick,5 Conn. App. 649 (1985).
Section 46b-56a of the General Statutes provides in part as follows:
 "For the purposes of this section, `joint custody' means an order awarding legal custody of the minor child to both parents, providing for joint decision-making by the parents and providing that physical custody shall be shared by the parents in such a way as to assure the child of continuing contact with both parents." (Emphasis supplied.)
There exists a definite conflict between the parties. They have not been able to communicate with one another. Dr. Alexander reports that they have been able to communicate sufficiently about important matters concerning the children. She notes that there needs to be a structured visitation schedule that is predictable and frequent. She is hopeful that with time the parties will achieve flexibility and some spontaneity.
Dr. Alexander also met with Mark Maisano, a man with whom the plaintiff is very friendly and whom she hopes to marry at the conclusion of these proceedings. She noted that the relationship between Mr. Maisano and the children was a good one. It must also be noted that Dr. Alexander had great faith in the parties' abilities to work out their differences in the best interests of the children.
The court, in reaching a decision on the issue of sole vs. joint custody of the children must be guided by the provisions of § 46b-56 (b) of the General Statutes, which provides, in part, as follows:
 In making or modifying any order with respect to custody or visitation, the court shall (1) be guided by the best interests of the child, giving CT Page 11713 consideration to the wishes of the child if the child is of sufficient age and capable of forming an intelligent preference, provided in making the initial order the court may take into consideration the causes for dissolution of the marriage or legal separation if such causes are relevant in a determination of the best interests of the child. . . .
It is the "best interests" of the children which must, then, control the court's decision in this case.
The children have been represented by able counsel. Since the children are but 8 and 6 years of age, they are not "of sufficient age and capable of forming an intelligent preference." The court has considered the best interests of the children in making its decision in this case. In 1991 the Hon. Frederick Freedman entered an order in the case of Tabackman v. Tabackman,25 Conn. App. 366, which will solve the problem in this case and that is by giving the plaintiff the final decision-making authority regarding the children in the event the parties are unable to agree.
The defendant is desirous of additional overnights during the week. Dr. Alexander does not recommend this at the present time since she believes it results in "jostling between houses" which denies the girls the stability that they should have at the present time. She expressed it thus: "The kids need one place's" She recommended a review of the situation in two years. The parties must also bear in mind that the children will have "burgeoning social needs" as they get older and their schedule must be considered by each of the parents.
In 1984, the plaintiff's father was one of three partners involved in a land development corporation known as Morningside Development Corporation. At that time, after her graduation from the police academy, she discussed with her father her wish to have a home of her own. Her father had maps of the proposed subdivision the corporation was then constructing. She and her father walked the land and plaintiff picked out lot number 29. In early April, 1986, she paid her father $25,000 for the lot. The plaintiff's parents did the same for two other daughters, conveying lots to each for $25,000, each conveyance representing a $20,000 gift since the amount paid to the corporation for each lot was $45,000. The lot was actually conveyed to the plaintiff CT Page 11714 November 11, 1986. (See plaintiff's exhibit K.) Construction of the house commenced in August, 1987.
It is important in this case to consider each of the parties' contribution to the cost of the house since each still maintained separate accounts. Unfortunately, the plaintiff and the defendant disagree on the amount of contribution by each. The plaintiff's testimony, however, is the weightier and more credible testimony in this regard, and the court has accepted that testimony which has been corroborated by the evidence (plaintiff's exhibits E, F, G and H) and the testimony of plaintiff's father, Mr. Robert Brown.
The court has had numerous figures for the value of the lot at the time it was conveyed. Mr. Brown testified that a comparable lot went for $125,000. Gary Smith, a real estate appraiser called by the defendant testified to a value of $80,000. Carol Cashman, a real estate appraiser called by the plaintiff testified to a value of $110,000. The court finds a value for the lot in November, 1986 to be $100,000.
Mr. Smith testified the present value of the house and lot is $252,000 (see defendant's exhibit 11). Ms. Cashman testified the present value of the house and lot is $260,000 (see plaintiff's exhibit B).
Plaintiff testified that she had savings of $35,000 which she contributed to the cost of the house. The defendant received $10,000 for a boat accident and this money went into the house. The defendant also received $7,800 for his hypertension on his termination with the Milford Police Department and this was also contributed to the cost of the house. Additionally, each contributed about half of a joint account of $7,000. The plaintiff also contributed money she received in settlement of two personal injury claims totally $6,667 (see plaintiff's exhibit O).
The plaintiff's parents loaned money to the parties for the construction of the house. This so-called "mortgage" was paid by the parties from joint funds. The total advanced was $120,000. There remains a balance of $22,200.
The court considers that each of the parties contributed equally in an amount of $48,900. Total contributions by the plaintiff, therefore, with the land valued at $100,000 amounts to CT Page 11715 $193,567. Total contributions by the defendant amounts to $69,700. Total cost including the remaining mortgage balance is $285,467. The defendant's percentage contribution based on cost is found to be 24.41%.
The court finds the present value of the house to be $260,000. If the property were to be sold, the remaining money owed to the Robert Browns would have to be paid, a brokerage commission of six percent and costs of sale including attorneys' fees, conveyance taxes and recording fees estimated at $2,000 leaves a net equity of $220,200. The defendant's interest in 70 Dawn Drive, Stratford, I find valued at $53,750. Since the Ford Bronco and the Maui Timeshare are owned jointly, the plaintiff's half share of the Maui Timeshare valued at $11,000 and her half share in the Ford Bronco valued at $6,000 should be credited against the defendant's equitable interest in Dawn Drive resulting in a figure of $36,750, which the court shall round off at $37,000.
In 1987, the defendant was retired on permanent disability from the Milford Police Department because of hypertension. He receives a pension of $645 per week. He worked as a private investigator for a period of time from 1989 to 1992. He has not renewed his private investigator's license and stopped because he thought there was some conflict with Ms. Brown's position as a State Trooper. Evidence provided by Detective Roland Labeck demonstrated this would not be so.
The defendant is 46 years of age and appears to be in good health. He graduated from Jonathan Law High School in 1969 and attended the University of New Haven in the year 1969-1970. He studied law enforcement. He attended the State Police Academy in 1971-1972 and graduated, thereafter becoming a Milford Police Officer. From 1972-1978, he served as a patrolman and from 1978-1984 as an investigator in the Detective Bureau. From 1984-1988, he served as a Detective Sergeant. He is now on a disability pension.
The plaintiff is 37 years of age and in good health. As a Connecticut State Trooper, she works five days and then has three days off. Her shift is days. Her shift begins at 7:00 in the morning and ends at 3:00 p. m. The shifts are in 8 week cycles. The girls are in school full time and the plaintiff arranges for someone to be with them at 6:30 in the morning when she leaves for work and she is usually home when they come home from school. CT Page 11716
The marriage of the parties has broken down irretrievably. Again, the parties' testimony concerning their relationship is quite diverse. The defendant has testified to the wife's infidelity that he says she admitted. The plaintiff denies that there were any extramarital sexual relationships and has testified that there were occasions when the defendant made rude and hurting remarks, accused her of relationships that did not exist, criticized her cooking and housekeeping and forced himself upon her sexually, and was physical with her on occasions until she "felt like a horse that he kept beating down", all of which was denied by the defendant. As was true of the testimony about contributions to the house, the more credible testimony was that of the plaintiff and the court finds on that issue in favor of the plaintiff.
Trial in this matter consumed seven days. There were numerous witnesses, but their testimony was mostly confined to the issue of custody-visitation or house and lot values.
On the issue of division of property, the defendant seeks equal division of the Tucker Anthony College Bonds, the custodial account in First Albany Corporation for the children and the Tucker Anthony joint account (see defendant's Claims for Relief, paragraph 7.3). The plaintiff seeks an order that these accounts be maintained for the children seeks plaintiff's Claims for Relief, paragraph 10). The plaintiff testified these bonds were begun for the children's college education.
The Tucker Anthony College Bonds are in the names of the plaintiff as custodian under the Uniform Gifts to Minors Act. This is true also of the First Albany Bonds. These securities are held for the children and are the children's property. (See plaintiff's exhibit S.) The Tucker Anthony account that is in the joint names of the parties is a true joint account with a value of $14,278.64 as of June 30, 1997.
On the issue of support, the plaintiff has submitted a child support guidelines worksheet which provides that the plaintiff would provide 52% of the support guideline amount and the defendant would provide 48% of the guideline amount of $387. Support is governed by the provisions of § 46b-84 of the General Statutes, which in subsection (c) provides as follows:
In determining whether a child is in need of maintenance and, CT Page 11717 if in need, the respective abilities of the parents to provide such maintenance and the amount thereof, the court shall consider the age, health, station, occupation, earning capacity, amount and sources of income, estate, vocational skills and employability of each of the parents, and the age, health, station, occupation, educational status and expectation, amount and sources of income, vocational skills, employability, estate and needs of the child.
The court must consider the factors of this section in making a determination on support. Also to be considered is §46b-215b of the General Statutes which provides that in all determinations of support there shall be a rebuttable presumption that the amount of any award which resulted from the application of the guidelines is the amount of support to be ordered. There has been no evidence to rebut this presumption or to permit the court to deviate from the guideline amount. In setting the amount of support, the court has considered the guideline amount and has considered the factors of § 46b-84 (c).
As previously noted, the children have been well represented by able counsel. Counsel has filed an affidavit setting forth her background in family law and her expertise together with her itemization of services. Her first affidavit of September 30 has been supplemented by a further affidavit of October 6. Her total charges through October 6 are $15,940. To this, however, must be added her time for October 7, 8, 9 and 10, or an additional $6,000. The court finds Twenty-two Thousand ($22,000) Dollars to be a fair and reasonable fee for counsel's services. Of this amount, $5,280 has been paid, leaving a balance of $16,720. Pursuant to the provisions of § 46b-62, the court may order the father or the mother, individually or in any combination, to pay the reasonable fees of counsel for the minor children.
Counsel for the minor children stated in final argument that this was the first time she has been unable to persuade the parties to accept her recommendation on the issues of custody and visitation. The court shall order that the parties each pay one-half of the remaining balance of $16,720 or $8,360.
Both counsel for the plaintiff and counsel for the defendant have submitted affidavits regarding fees. The court has considered the provisions of § 46b-62 with respect to each counsel's requests for fees and the criteria of § 46b-82. Defendant's counsel has incurred fees in an amount of $23,500 CT Page 11718 even though he is defendant's third counsel. Plaintiff's counsel has incurred fees in the amount of $26,600 even though she is plaintiff's second counsel. The fees incurred by each counsel were necessary and required on behalf of her or his client in such a contested custody proceeding. As counsel for the children expressed, she would have far preferred the amount of $22,000 to have been contributed to the children's college education fund. The fees of all counsel are found to be fair and reasonable.
This is a case originally referred to the Regional Family Trial Docket in Middletown. Because of a conflict, the case was referred to the undersigned for disposition.
With regard to assignment of property, the Appellate Court in the case of Emanuelson v. Emanuelson, 26 Conn. App. 527, 530, 531
(1992) stated as follows:
 "General Statutes § 46b-81 (c) requires the trial court to evaluate certain factors before distributing the parties' assets in a marital dissolution action. Although the court must evaluate all the factors listed, it has broad discretion when applying the statutory factors to assign the parties' assets. O'Neill v. O'Neill, 13 Conn. App. 300, 312, 536 A.2d 978, cert. denied, 207 Conn. 806, 540 A.2d 374 (1988)."
The court in O'Neill v. O'Neill, supra, at page 311, stated as follows:
 "The purpose of a lump sum distribution as a property settlement is to make an equitable division of property. McPhea v. McPhea, 186 Conn. 167, 170, 440 A.2d 274 (1982). A court must, therefore, `unscramble' ownership of property in order to give each spouse what is equitably his or hers. Id. An equitable division of property upon divorce or dissolution envisions that full recognition by the courts will be given to the noneconomic contributions of both spouses. (Citations omitted.)
 A property division ought to accord value to those nonmonetary contributions of one spouse which enable the other spouse to devote substantial CT Page 11719 effort to paid employment which, in turn, enables the family to acquire tangible marital assets. The investment of human capital in homemaking has worth and should be evaluated in a property division incident to a dissolution of marriage. We hold, accordingly, that an equitable distribution of property should take into consideration the plaintiff's contributions to the marriage, including homemaking activities and primary caretaking responsibilities.
With regard to alimony, the Supreme Court has stated as follows:
 To begin with, our alimony statute does not recognize an absolute right to alimony, General Statutes § 46b-82; Thomas v. Thomas, 159 Conn. 477, 487, 271 A.2d 42
(1970); `This court has reiterated time and again that awards of financial settlement ancillary to a marital dissolution rest in the sound discretion of the trial court.' (Citation omitted.) Although the court is required to consider the statutory criteria of length of marriage, causes for dissolution, the age, health, station in life, occupation, amount and sources of income, assets and opportunity for future acquisitions of assets of each of the parties, (citation omitted), no single criterion is preferred over all the others. In weighing the factors in a given case, the court is not required to give equal weight to each of the specified items. Nevertheless, it is rather obvious that in making financial determinations, the financial circumstances, both actual and potential, are entitled to great weight. Valente v. Valente, 180 Conn. 528, 530
(1980); Watson v. Watson, 221 Conn. 698, 710 (1992).
The court has considered all of the criteria of §§ 46b-81,46b-82, 46b-84, together with the provisions of §§ 46b-56,46b-56a, 46b-62 and 46b-215b of the General Statutes together with all the evidence and the case law. Since "[i]t would serve no useful function to require the trial court ritualistically to rehearse the statutory criteria that it has taken into account",Scherr v. Scherr, 183 Conn. 366, 368 (1981), this court will not recount those statutory criteria and the evidence, other than as has been previously stated. "The court is not obligated to make express findings on each of these statutory criteria." Weiman v.CT Page 11720Weiman, 188 Conn. 232, 234 (1982).
The court, in addition to the foregoing findings, finds as follows:
1. There is the requisite jurisdiction.
2. The allegations of the complaint have been proved and are true.
3. The marriage of the parties has broken down irretrievably and it is hereby dissolved.
4. The defendant is the one primarily at fault for the breakdown of the marriage.
5. It is in the best interests of the minor children that an order for joint legal custody should issue and that the children reside with the plaintiff.
6. At the time of trial, the defendant was one week in arrears on the pendente lite order for support. An arrearage is, therefore, found of $182.
7. Prior to the parties' separation, the defendant withdrew $6,000 from a joint account. The defendant should return $3,000 to the plaintiff for her share of that account.
8. An order was entered on January 23, 1997 (Ballen, J.) that the defendant pay one half of the uninsured and unreimbursed medical expenses for the minor children. There are outstanding optical and dental bills for the children, the defendant's share being in the amount of $181.95, which has not been paid.
The court enters the following orders.
1. A decree of dissolution of the marriage of the parties shall enter on the ground of irretrievable breakdown of the marriage.
2. The parties shall have joint legal custody of the parties' two minor children, Jessica Dooling, born CT Page 11721 January 23, 1989, and Jamie Dooling, born October 5, 1991.
3. The primary residence of the minor children shall be with the mother and she shall be responsible for and shall make all decisions concerning the daily routines and living arrangements of the minor children.
4. The father shall have the following reasonable, liberal and flexible rights of visitation with the two (2) minor children:
 a. During the school year, alternating weekends from after school on Friday until Sunday evenings at 7:00 p. m. During the summer, alternating weekends from Friday at 3:30 p. m. until Sunday evening at 7:00 p. m.
 b. During the school year, every Wednesday after school until Thursday morning when he returns them to school. During the summer, every Wednesday from 3:30 p. m. until Thursday evening at 7:00 p. m.
 c. When a Monday holiday coincides with the father's weekend visitation with the minor children, his weekend visitation shall be extended from the preceding Sunday evening at 7:00 p. m. until Monday evening at 7:00 p. m. except when it is a holiday designated for the plaintiff.
 d. Each party shall spend two (2) non-consecutive weeks with the minor children during their summer vacation. The parties shall confer and agree by the preceding March 1st of each year as to the scheduling of those vacations and the choice of the minor children's summer extracurricular activities, such as camp.
 e. During the minor children's summer vacation, unless the parties agree to send them to camp, the father shall also spend week days with the minor children when their mother is not working CT Page 11722 from 8:30 a.m. until 3:30 p. m., if this should be the mother's choice. The father shall notify the mother in writing by no later than the preceding June 1 of each year as to whether he wishes to spend the aforementioned time with the minor children. The aforementioned visitation shall not coincide with the visitation set forth in subparagraph d.
 f. The father shall spend Father's Day, St. Patrick's Day and his birthday each year with the minor children from 9:00 a.m. until 7:00 p. m. If the father's birthday or St. Patrick's Day is a school day, visitation shall be from after school until 7:00 p. m.
 g. The father shall be able to take the children to the St. Patrick's Day parade, regardless of whether the parade falls on the holiday.
 h. The mother shall spend Mother's Day and her birthday each year with the minor children from 9:00 a.m. until 7:00 p. m. even if it falls during the father's weekend visitation and shall not be replaced.
 i. The mother and father shall alternate the following holidays as follows:
 i. Fourth of July from 9:00 a.m. until the following morning at 9:00 a.m. (1998 — father);
 ii. Thanksgiving from the Wednesday before Thanksgiving at 3:00 p. m. until the following Sunday evening at 7:00 p. m. (1997 — Father);
 iii. Christmas Eve Day at 10:00 a.m. until Christmas Day at 10:00 a.m. (1997 — Mother);
 iv. Christmas Day at 10:00 a.m. until December 26 at 10:00 a.m. (1997 — Father);
v. the parties shall equally divide the CT Page 11723 remaining balance of the Christmas week as follows: December 26 at 10:00 a.m. until December 29 at 6:00 p. m. (1997 — Mother) and December 29 at 7:00 p. m. until January 2 at 7:00 p. m. (1997 — father;
 vi. Easter from Holy Thursday at 3:30 p. m. until Easter Sunday at 7:00 p. m. (1998 — mother).
 j. The parties shall alternate spending the February/Winter and April/Spring vacations each year with the minor children (February/Winter 1998 — mother; April Spring 1998 — father). If the father's weekend visitation occurs in this period and the children are with him, it shall not be replaced. If the father's weekend visitation occurs during this period and the children are with the mother, his weekend visitation will not be replaced.
 k. The parties shall alternate spending the children's birthdays each year with the minor children even if the birthday occurs during the father's weekend visitation.
5. The mother and father shall confer and endeavor to agree about all important matters concerning their minor children's health, education, and general well-being, including school, camps, elective or cosmetic medical treatment, psychological or psychiatric treatment and the like. In the event the parties are unable to agree after consultation, the mother shall have the final decision-making authority.
6. When the children are with one parent, they shall have reasonable telephone contact and facsimile contact with the other party. Neither party shall prevent or hamper the children from communicating with the other party.
7. The parties shall share equally all transportation of the children for pick up and return to each parent's respective residence. CT Page 11724
8. Each of the parties shall immediately furnish the other party with copies of any reports from or to third persons or institutions concerning the health, education or welfare of the minor children and shall notify the other party of all school and extracurricular functions and activities in which the minor children are involved. Each party shall be entitled to complete, detailed information from any pediatrician, general physician, dentist, consultant, therapist or other specialist attending either minor child for any reason whatsoever and to be furnished with copies of any reports given by them, or to them, to the other party. Each party shall be entitled to receive or obtain all records, reports, or results from any school which either minor child is attending or from or to any teacher, guidance counselor, or other official therein, and both may participate equally in all school functions and activities of which each party may receive notice.
9. Neither Party shall make disparaging comments about the other party or the other party's family to or in the presence of the minor children. The parties shall exert every reasonable effort to foster a feeling of affection between the children and the parties. Neither party shall do anything which may estrange the children from the other parent or injure the opinion of the children as to their mother or father.
10. Neither party shall remove the minor children from the United States of America or its territories, or Canada without the prior written consent of the other party, which consent shall not be unreasonably withheld.
11. The defendant shall continue to maintain medical insurance for the minor children, and the plaintiff shall continue to maintain dental insurance for the benefit of the minor children, and the parties shall share equally the cost of any and all unreimbursed medical, dental, psychiatric, psychological and/or prescription expenses for the children. The plaintiff shall have the benefit of the provisions of § 46b-84 (d) of the General CT Page 11725 Statutes.
12. The defendant shall pay to the plaintiff child support in the amount of $186.00 per week until each child attains the age of nineteen or reaches the age of eighteen and has graduated from high school, whichever shall first occur.
13. The defendant shall pay to the plaintiff the support arrearage of $182.00 within thirty (30) days of the date hereof.
14. The defendant shall pay to the plaintiff the sum of $182.00 as his share of the unreimbursed medical, dental and optical expenses for the minor children within thirty (30) days of the date hereof.
15. Defendant shall maintain a life insurance policy of $7,000 for the benefit of the minor children for so long as he has a duty to support.
16. The parties shall retain their respective pension and/or retirement plans and the parties shall waive any right or claim to the other's respective pension and/or retirement plans.
17. The custodial accounts for the children shall be maintained for their benefit with the plaintiff as custodian under the Uniform Gifts to Minors Act.
18. The first Albany joint account shall be assigned and transferred by the parties to an account in the name of the plaintiff as custodian for the minor children under the Uniform Gifts to Minors Act.
19. The defendant has an equitable interest in the real property located at 70 Dawn Drive in Stratford, Connecticut. The plaintiff shall pay the defendant by way of an assignment of estate pursuant to § 46b-81 of the General Statutes the sum of Thirty-seven Thousand ($37,000) Dollars within ninety (90) days of the date hereof for his equitable interest in the real property, less her share of the Maui Timeshare and her share of the CT Page 11726 Ford Bronco.
20. The plaintiff shall assign and transfer to the defendant all of her right, title and interest in and to the 1989 Ford Bronco automobile as soon as said title transfer can be accomplished. The defendant shall indemnify and hold harmless the plaintiff on any outstanding tax bills or insurance premiums.
21. The plaintiff shall assign, transfer and convey to the defendant all of her right, title and interest in and to the Kamoli Beach Club, Maui Hawaii Timeshare within thirty (30) days of the date hereof, and shall indemnify and hold harmless the plaintiff on any outstanding charges or expenses associated therewith.
22. The defendant shall be entitled to take the oldest child as an exemption on his federal and state tax returns for so long as he is responsible for her support. The plaintiff shall be entitled to take the younger child as an exemption on her federal and state tax returns. The plaintiff shall cooperate in signing any documents required by the Internal Revenue Service to allow the defendant to take the exemption for the oldest child in accordance with the provisions hereof.
23. The parties shall retain all funds in their respective bank and/or credit union accounts as listed on their respective financial affidavits.
24. The parties have two joint VISA accounts with the plaintiff currently responsible for one account and the defendant currently responsible for the other. The parties shall each continue to be responsible for the account she or he is paying and shall indemnify and hold the other harmless thereon. Except as noted herein, the parties shall each be solely responsible for all other liabilities listed on her or his financial affidavits. The plaintiff shall be wholly responsible for the outstanding indebtedness owed to her parents on the original loan for the construction of the home at 70 Dawn CT Page 11727 Drive in Stratford.
25. All of the contents, personal property and furnishings located at 70 Dawn Drive in Stratford shall be the property of the plaintiff except for the items listed on the attached Schedule A, which shall be the sole property of the defendant. The 380 cal. Sigsauer shall be the property of the plaintiff and shall be returned to her by the defendant within thirty (30) days of the date hereof. All items of personal property other than the Sigsauer currently in the defendant's possession shall be his free of any claim by the plaintiff.
26. The parties shall share equally any remaining balance of the fees for the attorney for the minor children, as well as for any remaining balance for the fees for the psychological evaluation conducted by Dr. Karen Alexander, as well as for Dr. Alexander's testimony in court.
27. The issue of custody and visitation shall be returned to Family Relations for a revaluation early in the year 2000. Counsel for the children should, by appropriate motion, take those steps necessary to see that this issue is so referred.
28. Each party shall pay her or his own attorney's fees.
Orders shall enter in accordance with the foregoing.
EDGAR W. BASSICK, III
JUDGE TRIAL REFEREE
SCHEDULE A
Clothes, footwear, hats, etc.
Personal photographs — police pictures, boat pictures, etc.
Collection of sea shells obtained while scuba diving.
Wooden Dry Sink — built by defendant's father CT Page 11728
Boxes of miscellaneous belongings stored in attic
Luggage
19" RCA Color TV
Office equipment including desk, chair, computer table, (1) wall unit
Ski equipment and stair stepper
Tools, power tools
Knives — scuba knife, gerber knife
Personal papers
Personal jewelry, although plaintiff testified it is no longer at the house
Camping equipment
Boating equipment
7' Nautical Chart — Long Island Sound
King size waterbed and accessories
Sectional living room set plus reclining chair and coffee table bought with set (located in Family Room)
Wicker breakfast table and chairs, (2) wicker coffee tables
Two picnic tables (blue/red)
Floor lamp in family room
All boating paintings from Cape Cod
Flower paintings from Cape Cod
Automatic bread maker
Spare refrigerator CT Page 11729
Oak entertainment center including TV, stereo, tuner, radio, tape/CD player and speakers
An equal division of the audio tapes and CD's
35mm Camera, lens and tripod
All negatives of family photos will be made available to the defendant for copying at his expense.
Arrangements for copying all family VCR tapes may be made by the defendant, which shall be at his expense.